998 A.2d 543

VONNIE CORNETT, INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF BILLIE CORNETT, DECEASED, PLAINTIFFS-AP-
PELLANTS, v. JOHNSON & JOHNSON AND CORDIS CORP.,
DEFENDANTS-RESPONDENTS.

ERNIE WILLIAMSON AND ALISHA WILLIAMSON, PLAIN-
TIFFS-APPELLANTS, v. JOHNSON & JOHNSON AND
CORDIS CORP., DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued June 8, 2010—Decided July 23, 2010.

370

Before Judges PARRILLO, LIHOTZ, and ASHRAFI.

*Bruce D. Greenberg* and *Peter E. Seidman (Milberg LLP)* of the New York bar, admitted pro hac vice, argued the cause for appellants (*Lite DePalma Greenberg LLC, Mr. Seidman,* and *Alastair Findeis (Milberg LLP)* of the New York bar, admitted pro hac vice, attorneys; *Mr. Seidman* and *Mr. Findeis,* of counsel; *Mr. Greenberg* and *Mayling C. Blanco,* on the briefs).

*Peter C. Harvey (Patterson Belknap Webb & Tyler, LLP),* argued the cause for respondents.

The opinion of the court was delivered by

PARRILLO, J.A.D.

At issue in these consolidated appeals is whether State causes of action in strict product liability, breach of express and implied warranty, and derivative claims for alleged defects in a medical device, the Cypher® Sirolimus–Eluting Coronary Stent (Cypher or device), manufactured by defendant Cordis Corporation (Cordis or defendant) are preempted by the Medical Device Amendments of 1976 (MDA), 21 *U.S.C.A.* §§ 360c–360m, to the Food, Drug, and Cosmetic Act (FDCA), 21 *U.S.C.A.* §§ 301–399. Also at issue is whether Kentucky's or New Jersey's statute of limitations applies to one of these matters for purposes of determining whether the action is time barred. We hold that under either State's law of repose, the action filed by plaintiff Vonnie Cornett, individually and on behalf of the estate of her deceased husband Billie Cornett, is untimely and therefore, affirm the dismissal of her complaint. We also hold that certain claims of all remaining plaintiffs are federally preempted and accordingly affirm the Law Division's dismissal of those claims, but otherwise reverse the dismissal of their other claims and remand.

In September 2008, plaintiffs Vonnie Cornett (Vonnie) and Ernie and Alisha Williamson (collectively Williamsons) filed separate actions in the Law Division for alleged defects in the Cypher drug-coated arterial stent, a medical device manufactured by defendant Cordis, a wholly owned subsidiary of co-defendant Johnson & Johnson (J & J). They claimed negligence and strict

product liability for design defect, manufacturing defect, and failure to warn; breach of implied and express warranties; negligent misrepresentation and fraud; statutory punitive damages for product liability; and for the Williamsons, loss of consortium. In January 2009, Vonnie filed an amended complaint, which dropped the negligence claims, as well as negligent misrepresentation and fraud, while adding claims for wrongful death, survivorship, and loss of consortium.[1]

Forty-six other cases were consolidated with the Williamsons' action, which was further consolidated with Vonnie's action. The court granted plaintiffs' motion to adopt a "master complaint," and ordered that Vonnie's amended complaint "be deemed to have amended" the complaints in all the cases "with respect to those allegations and causes of action that are common[.]"

In January 2009, defendants moved to dismiss in lieu of answering, pursuant to *Rule* 4:6–2(e). Following argument on April 17, 2009, the court, applying Kentucky's statute of limitations, dismissed Vonnie's action as, among other reasons, untimely, and dismissed the remaining actions on the ground that federal approval of the device preempted all State causes of action.

By way of background, the first arterial stents were made of bare metal. A stent is a tiny metal mesh tube that is implanted in the coronary artery to open the artery and improve blood flow through the heart. The healing process after the implantation of any stent is the beneficial regrowth atop the stent and arterial wall of endothelial tissue, the normal artery lining that reduces the risk that a blood clot, or thrombus, will form and adhere. To prevent such clots during the period that regrowth was believed to require, patients were prescribed an antiplatelet drug like Plavix.

---

1 Plaintiffs do not appeal the dismissal of their Consumer Fraud Act claim, apparently due to our ruling that failure to warn may only be asserted as a product liability claim. *McDarby v. Merck*, 401 *N.J.Super.* 10, 94–98, 949 A.2d 223 (App.Div.2008), *appeal dismissed*, 200 *N.J.* 267, 979 A.2d 766 (2009).

Cordis, incorporated in Florida with its principal place of business there, is a wholly-owned subsidiary of J & J, a New Jersey corporation with its principal place of business here. Cordis operates facilities worldwide, including one in Warren, New Jersey.

Cordis, as well as other manufacturers, developed "drug-eluting stents," which were coated with slow-release drugs intended to inhibit excessive regrowth and thus prevent the artery from being narrowed through the build-up of new tissue. The drug-eluting stent at issue here is Cordis' Cypher stent, which Cordis coated with sirolimus, a chemotherapy drug from Wyeth that slows cell growth and, in turn, the healing process. Cordis used the polymer PEVA/PBMA to bind sirolimus to the device's metal surface.

The Cypher is a Class III medical device regulated by the Food and Drug Administration (FDA) pursuant to the MDA. Class III devices are used for "supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health[.]" 21 *U.S.C.A.* § 360c(a)(1)(C)(ii)(1). "Class III devices receive more extensive federal oversight than any other class of medical devices and are subject to a comprehensive and rigorous process known as premarket approval ("PMA")." *Riley v. Cordis Corp.,* 625 *F.Supp.*2d 769, 774 (D.Minn.2009); *see Riegel v. Medtronic, Inc.,* 552 *U.S.* 312, 128 *S.Ct.* 999, 1004–05, 169 *L.Ed.*2d 892 (2008); 21 *U.S.C.A.* § 360e. As part of its application for PMA, a manufacturer must provide the FDA with "reasonable assurance" that the device is both safe and effective. 21 *U.S.C.A.* § 360e(d)(2). The manufacturer must comply with all design, manufacturing, and labeling specifications set forth in a PMA approval order. 21 *C.F.R.* § 814.80. The FDA continues its oversight of the safety and effectiveness of PMA-approved devices after approval. *See, e.g.,* 21 *C.F.R.* § 814.39(a).

On April 24, 2003, the FDA approved Cordis' application for premarket approval of Cypher. The approval letter stated that Cypher was "indicated for improving coronary luminal diameter in patients with symptomatic ischemic disease due to discrete *de*

*novo* lesions of length ≤ 30 mm in native coronary arteries with a reference vessel diameter of ≥ 2.5 to ≤ 3.5 mm." The letter instructed that advertising "and other printed materials ... should not include indications or claims not included in the FDA-approved labeling[,]" with the examples of "use in diabetic patients, small vessels (< 2.5 mm diameter), in-stent restenosis, bifurcation lesions, or patients with acute myocardial infarction."

The letter noted that the "[l]ong-term outcome (beyond [twelve] months) for this permanent implant is unknown at present[,]" and it imposed several conditions on the approval. For five years, Cordis was to collect and submit annual updates on the clinical outcomes of the patients in the preapproval clinical studies. Defendant was also to collect such information on 2,000 other United States patients "to evaluate the potential for less frequent adverse events" that "could not be detected in your initial clinical trials" or that "may have resulted from changes in the manufacturing process between the production of the clinical trial lot and commercial scale-up." In addition, Cordis had to monitor and report changes made in the label for sirolimus, and seek supplemental PMA to effect any appropriate corresponding changes to the device's label. Other manufacturers also obtained FDA approval of their drug-eluting stents.

In April 2004, the FDA sent Cordis a warning letter that described several failures at its facilities, in Warren and out-of-state, to satisfy federal requirements for manufacturing processes and administrative practices that validate conformity to a device's design, and to identify nonconforming product and prevent its distribution. At Cordis's multiple facilities, the FDA noted there were incidents in which Cordis decided that laboratory test results of "[o]ut-[o]f-[s]pecification" for some lots were invalid, or, with respect specifically to its Florida facility, in which lots of devices with "[redacted] coated defects" were released without "adequate data or justification" for Cordis' conclusion that the nonconformity posed a minimal safety risk.

According to the master complaint, in the meantime, Cordis began marketing the device. Defendants represented at medical conferences that significant endothelial regrowth occurred within thirty days of implantation, and that patients would only have to take antiplatelet drugs for ninety days. The master complaint further alleges that Cordis also promoted off-label uses. A May 2004 press release said that clinical studies "suggest" the device also had the "potential" to "treat higher-risk and more challenging blockages" and an October 2005 press release asserted that a study of patients with chronic total occlusions had better clinical outcomes with the device than with bare-metal stents. In March 2007, another press release declared that a two-year study including off-label uses showed a low rate of adverse events, and no differences in the rates of mortality or stent thrombosis between patients who had received the device for approved versus off-label uses.

The master complaint went on to claim that while defendants distributed those studies, they did not include information about the adverse events that the studies reported, and they withheld other relevant treatment information they had about off-label uses. For example, post-marketing studies of clinical results showed that some patients who received a drug-eluting stent did not have endothelium regrow over the stent for at least four years. Others showed that patients who were no longer taking antiplatelet drugs had significantly higher rates of heart attacks and death at eighteen to thirty-six months after implantation. Such patients also had a higher rate of stent thrombosis, which did not diminish over time, but rather increased linearly. The studies indicated that the drug coating had prevented regrowth in those patients by damaging their endothelium.

According to the master complaint, in December 2006, the FDA convened an advisory panel, which reported an increased risk of thrombosis for drug-eluting stents from one to four years after implantation compared to bare-metal stents. The "risk of all causes of death" was no higher overall than for bare-metal stents,

although the subgroup of patients who received a drug-eluting stent for off-label use had a significantly increased risk of late thrombosis "associated with death and myocardial infarction" compared to patients who received such stents for approved uses.

Billie Cornett, Vonnie's decedent, resided in Kentucky and was presumably treated there. He had coronary artery disease that was treated with implantation of a Cypher stent on December 16, 2004. He also had diabetes, which made the use of the device in him off-label. On May 18, 2005, a cardiac catheterization disclosed a subacute thrombosis in the artery with the stent. Billie died on June 1, 2005, purportedly from subacute stent thrombosis arising from the device's implantation. As noted, Vonnie filed her complaint in September 2008.

The Williamsons resided in Illinois. Ernie's only asserted injury was that simply having the device required long-term antiplatelet therapy and the exposure to whatever risks that might entail. Their complaint did not state the date when he received the device, name his medical condition, or assert that the use of the device in him was off-label.

I.

As noted, the court, applying Kentucky's statute of limitations, granted defendants' motion to dismiss Vonnie's complaint as untimely. Plaintiffs argue the choice of law should have been that of New Jersey, which has a strong governmental interest in discouraging domestic corporations from manufacturing and distributing unsafe products within the State. Applying New Jersey's discovery rule, plaintiffs further contend that no patient is expected to understand the possibility of injury from a medical device before the medical community has reached such an understanding concerning patients with the same condition. We disagree.

Choice of law analysis is necessary when the statute of limitations of one potential forum would bar a claim as untimely but that of another would not. *Gantes v. Kason Corp.*, 145 *N.J.*

478, 481–82, 679 *A.*2d 106 (1996). In this regard, in New Jersey, the limitation period for product liability actions is two years after the cause of action "shall have accrued." *N.J.S.A.* 2A:14–2(a); *Burd v. N.J. Tele. Co.*, 76 *N.J.* 284, 288, 386 *A.*2d 1310 (1978). New Jersey courts apply a "discovery rule," under which a cause of action does not accrue "until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Lopez v. Swyer*, 62 *N.J.* 267, 272, 300 *A.*2d 563 (1973). The bases of a claim for personal injury are the plaintiff's awareness that he or she sustained an injury, and the understanding that the injury may involve another party's fault. *Vispisiano v. Ashland Chem. Co.*, 107 *N.J.* 416, 427, 527 *A.*2d 66 (1987). When the plaintiff is aware of a " 'state of facts' " indicating that a third party's unreasonable conduct might have contributed to the injury, "medical or legal certainty is not required." *Lapka v. Porter Hayden Co.*, 162 *N.J.* 545, 555–56, 745 *A.*2d 525 (2000) (internal citation omitted).

In Kentucky, on the other hand, the limitation period for a personal injury claim is one year. *Ky.Rev.Stat. Ann.* § 413.140(1)(a) (LEXIS 2010); *Fluke Corp. v. LeMaster*, 306 *S.W.*3d 55, 60 (Ky.2010). It may be extended by another year for the representative of a decedent who died before the period ran. *Ky.Rev.Stat. Ann.* § 413.180(1) (LEXIS 2010).

Kentucky statutes provide a discovery rule in limited circumstances that do not include product liability claims. *Ky.Rev.Stat. Ann.* § 413.140 (LEXIS 2010); *Fluke Corp., supra*, 306 *S.W.*3d at 60–61. The discovery rule that Kentucky limits to medical malpractice claims resembles the rule that New Jersey applies to all claims: a claim accrues when "the injury is first discovered or in the exercise of reasonable care should have been discovered[.]" *Ky.Rev.Stat. Ann.* § 413.140(2) (LEXIS 2010). However, Kentucky also imposes an outer limit of five years from when the alleged negligence occurred. *Ibid.*[2]

---

[2] While Kentucky courts have sometimes applied a discovery rule to avoid legislative infringement of common-law causes of action that existed prior to

Assuming, therefore, a reasonable probability that the application of Kentucky versus New Jersey law would have led to different results on the question of Vonnie's timeliness, we next consider which state's law applies. In *P.V. ex rel. T.V. and L.V. v. Camp Jaycee*, 197 *N.J.* 132, 138–43, 962 *A.*2d 453 (2008), the Court adopted the standard in the *Restatement (Second) of Conflict of Laws* (1971) (Restatement) for choice-of-law questions, which was the "most significant relationship" test. *See also Fu v. Fu*, 160 *N.J.* 108, 119–39, 733 *A.*2d 1133 (1999). *P.V.* explained how the "governmental-interest" test used in *Gantes, Fu*, and other cases had become substantially similar to the *Restatement*'s "most significant relationship" test, to the point that it expressly relied on the *Restatement*'s statement of relevant factors and guiding principles. *P.V., supra*, 197 *N.J.* at 141–42, 962 *A.*2d 453. Unlike a "pure governmental interest analysis[,]" however, in which the relative strength of each state's governmental interests was "dispositive," the *Restatement* test used additional factors in assessing the significance of each state's contacts with the matter. *Ibid.*

Under the *Restatement* Section 146, the choice-of-law analysis in personal injury cases proceeds with the presumption that the law of the state where the injury occurred will apply " 'unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.' " *P.V., supra*, 197 *N.J.* at 141, 962 *A.*2d 453 (quoting *Restatement, supra*, § 146). Since Section 146 ap-

---

adoption of the state constitution, they have not extended that principle to "new [statutory] rights unknown at common law." *Wright v. Oberle-Jordre Co.*, 910 *S.W.*2d 241, 243 (Ky.1995). Nonetheless, *Fluke, supra*, was a product-liability case that discussed the discovery rule as a matter of equity. 306 *S.W.*3d at 60–61. It held that the intermediate court improperly applied the rule on the facts of the particular case, because the plaintiffs' injuries had been "immediately apparent" and they should have suspected both the cause and the identity of the responsible party within the statutory period, notwithstanding the manufacturer's alleged concealment of product defects from government regulatory agencies. *Ibid.*

plies to strict liability claims for personal injury, *Restatement, supra,* § 146 comment a, it therefore covers product liability actions. *Dorman v. Emerson Elec. Co.,* 23 *F.*3d 1354, 1359 (8th Cir.), *cert. denied,* 513 *U.S.* 964, 115 *S.Ct.* 428, 130 *L.Ed.*2d 341 (1994); *Kozoway v. Massey–Ferguson, Inc.,* 722 *F.Supp.* 641, 642–44 (D.Colo.1989); *McKinnon v. F.H. Morgan & Co.,* 170 *Vt.* 422, 750 *A.*2d 1026, 1028 (2000). Thus, because Billie Cornett's injury occurred in Kentucky, Section 146 recognizes that state as "likely to have the predominant . . . relationship to the parties and issues in the litigation." *P.V., supra,* 197 *N.J.* at 144, 962 *A.*2d 453.

Nevertheless, that presumption could be overcome. The *Restatement* lists a number of contacts that must be weighed in determining the state having the more significant relationship. *Id.* at 144–45, 962 *A.*2d 453. They are:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

[*Restatement, supra,* § 145(2)(a)-(d).]

The analysis of those contacts is "not merely quantitative." *P.V., supra,* 197 *N.J.* at 147, 962 *A.*2d 453. The purpose is to determine their bearing for the guiding touchstones of Section 6 of the *Restatement,* which, "[r]educed to their essence," are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Ibid.* (internal quotations and citations omitted).

In our view, the factors of Section 145 of the *Restatement,* when assessed in terms of the standards of Section 6, show that Kentucky had the more significant relationship to this case. The Cornetts were long-time Kentucky residents, and Billie received all medical care relating to his condition and the device there. Kentucky is where the stent was purchased, implanted and allegedly became blocked. *See Rowe v. Hoffman–La Roche, Inc.,* 189

*N.J.* 615, 629, 917 *A.*2d 767 (2007). This particular plaintiff was neither operated on nor injured in Kentucky by pure "happenstance[,]" so the place of injury could not be discounted as a fortuity. *P.V., supra,* 197 *N.J.* at 138, 145–46, 962 *A.*2d 453; *Fu, supra,* 160 *N.J.* at 137, 733 *A.*2d 1133. Kentucky was also the locus of the parties' relationship, because while Cordis issued its warnings and warranties from Florida, Billie and his healthcare providers received them or suffered from their omission in Kentucky. *Bearden v. Wyeth,* 482 *F.Supp.*2d 614, 620 (E.D.Pa.2006); *Accord Knipe v. SmithKline Beecham,* 583 *F.Supp.*2d 602, 615–16 (E.D.Pa.2008).

On the other hand, the fact that Cordis' parent company, J & J, is headquartered and incorporated in New Jersey is of tenuous relevance absent any showing that the subsidiary is merely its corporate parent's alter ego and lacks a separate corporate existence. Nor is it sufficient that Florida-based Cordis maintains one of a number of its facilities in New Jersey without any demonstration that specific and identifiable activities in the New Jersey operation contributed to decedent's injury. In this regard, plaintiff's only allegation even remotely related to New Jersey is that Cordis' Warren facility was among five others that, after plant inspections, received warnings from the FDA about certain manufacturing processes conducted on premises.

In any event, while New Jersey undoubtedly has an interest in regulating the safety of any activities in Cordis' Warren facility that might have contributed to the injury, *see Smith v. Alza Corp.,* 400 *N.J.Super.* 529, 545, 948 *A.*2d 686 (App.Div.2008), that concern was in competition with Kentucky's differing view of how stringently to regulate. The Kentucky product liability statutes do not have the same tests and standards as New Jersey's. *Compare Ky.Rev.Stat. Ann.* § 411.310 and 411.320 (LEXIS 2010) and *N.J.S.A.* 2A:58C–2 to –4. The Kentucky statutes also bar recovery when the plaintiff's negligence was a "substantial cause" of the injury, *Ky.Rev.Stat. Ann.* § 411.320(3), whereas New Jersey bars

recovery only if the plaintiff's negligence was the predominant cause. *N.J.S.A.* 2A:15–5.1.

These distinctions imply a different balancing of, on the one hand, the need to regulate product safety and, on the other, the need to avoid undue inhibition of the availability of products to consumers. Consequently, they reflect different "interests underlying the field of tort law[.]" *See P.V., supra,* 197 *N.J.* at 147–50, 962 *A.*2d 453 (internal quotations and citations omitted) (New Jersey's strong commitment to charitable immunity reflected different priorities than those served by Pennsylvania's abrogation of the immunity). The varying statutory standards also implicate the parties' interests and expectations, because they establish different substantive standards of conduct to be observed. *Id.* at 153–54, 962 *A.*2d 453. Kentucky's interest in its own weighing of those concerns applies to all in-state conduct by manufacturers, regardless of whether they are residents. *Id.* at 137, 149–50, 152–53, 962 *A.*2d 453.

Applying New Jersey law would thus threaten "the values of uniformity and predictability" that are the main interests of judicial administration, by impairing Kentucky's ability to regulate conduct within its borders according to its own standards. *Id.* at 153–54, 962 *A.*2d 453. That ability is a right to which our courts "have continuously deferred" notwithstanding the evolution of choice-of-law doctrines. *Id.* at 153, 962 *A.*2d 453. Infringement on that ability would obviously impair comity. By the same token, application of Kentucky law will not frustrate the policies of New Jersey insofar as both States' statutes of limitations are designed to bar stale claims arising out of distant occurrences while providing compensation to residents who are unlawfully injured. Moreover, New Jersey has little interest in protecting the compensation rights of a Kentucky resident. *See Deemer v. Silk City Textile Mach. Co.,* 193 *N.J.Super.* 643, 649, 475 *A.*2d 648 (App.Div.1984) ("New Jersey has no interest in protecting the compensation rights of a non-domiciliary resident."). Accordingly, we conclude, as did the motion judge, that the relative strength of New Jersey's

relationship with the parties and the issues compared to Kentucky's was insufficient to overcome the presumption in favor of applying Kentucky law.

Even were New Jersey law to apply, we find that plaintiff would fare no better. On its face, plaintiff's September 2008 complaint, alleging decedent's May 29, 2005 death from a blood clot in Cordis' medical device diagnosed on May 18, 2005, is time-barred. *N.J.S.A.* 2A:14–2(a); *N.J.S.A.* 2A:31–3. Plaintiff argues, however, that the causative link would not have been discovered until December 2006 when the FDA convened an advisory panel to examine the risks of thrombosis related to drug-eluting stents, and therefore, New Jersey's equitable discovery rule should operate to defer the accrual of her cause of action. We, as did the motion judge, disagree.

Generally, a cause of action accrues at the time of injury. *Tevis v. Tevis,* 79 *N.J.* 422, 431, 400 *A.*2d 1189 (1979). This is so because awareness of one's injuries is usually "immediate and knowledge that someone is at fault is inherent in the nature of the injury or the circumstances in which it occurred." *Yarchak v. Trek Bicycle Corp.,* 208 *F.Supp.*2d 470, 479 (D.N.J.2002).

Here, on May 18, 2005, a "sub acute stent thrombosis" was observed "in the area where the Cypher stent was placed." Thus, we may reasonably characterize the May 18, 2005 diagnosis of decedent's stent thrombosis as the date of the injury itself. The thrombosis was immediately apparent, and its diagnosis approximately five months after decedent received his stent on December 16, 2004, with no alleged intervening events, coupled with his death eleven days later, should have made plaintiff at least realize that Billie's death may have been related to a defect in the device or in its use. *Vispisiano, supra,* 107 *N.J.* at 427, 527 *A.*2d 66. After all, this was not the situation of a toxic tort, in which the injury arises years after the exposure. Since the thrombosis occurred in the artery where the device was implanted, a lay person could have reasonably suspected a possible connection between the medical device and decedent's injury, at least to have

investigated the matter further or to have contacted counsel. Indeed, even plaintiff acknowledges that it was self-evident from the cause of death that the thrombosis or blood clot formed within the Cypher stent.

Plaintiff nevertheless contends that the cause of action did not accrue until the medical community reached a consensus as to causation. But neither medical nor legal certainty is required if the state of facts would alert a reasonable person to the possibility of an actionable claim, *Lapka, supra,* 162 *N.J.* at 555–56, 745 *A.*2d 525, namely, that a third party's conduct may have contributed to the injury and the conduct might have possibly been unreasonable. *Savage v. Old Bridge–Sayreville Med. Group, P.A.,* 134 *N.J.* 241, 247–48, 633 *A.*2d 514 (1993). To posit otherwise, as plaintiff does, the statute of limitations would never run unless and until the relevant medical community reaches agreement as to its understanding of the correlation between a medical product and a particular medical condition. Yet, as noted, that is clearly not the standard. Given the proper measure, the present circumstances—especially the short interval of time involved—lead ineluctably to the conclusion that plaintiff had reason to believe that decedent's clot may have been caused by the stent and to realize that a possible cause of action might exist against defendant. Consequently, even if New Jersey law applies, plaintiff could not avail herself of the State's equitable discovery rule to cure the untimeliness, so her cause of action falls outside both states' limitations periods.

## II.

The Law Division dismissed the remaining counts in the master complaint for the consolidated matters, ruling that the express preemption provision for medical devices in the federal statutes precluded all of the plaintiffs' claims. In particular, the claimed express warranty was the patient information card and guide that the FDA had specifically approved as part of Cypher's label, so a claim "that these materials failed to conform with the materials

expressly approved by the FDA ... would be patently false." The claim for breach of express warranty was thus "nothing more than a defective labeling/failure to warn claim, which is preempted" for a device approved under the FDA's premarket approval regime.

The court further found that plaintiffs were simply declaring their claims to be parallel to federal requirements in order to invoke that exception to preemption, without using facts or legal authority to demonstrate that the standards for proving their claims were indeed equivalent to the federal requirements. Even if claims concerning off-label use were not categorically preempted, the amended complaint contained no allegations that defendants had promoted any particular off-label use.

On appeal, plaintiffs contend the court erred in finding their master complaint was preempted by federal law. They argue that federal law permits claims for violation of state-law duties that parallel federal requirements for medical devices, and that they pleaded each claim in conformity with that test. For reasons that follow, we conclude that some of plaintiffs' claims were properly dismissed as preempted, but that others should not have been rejected on a motion to dismiss.

As a threshold matter, we note the standard of review for the dismissal of a complaint under *R.* 4:6–2(e), for failure to state a claim on which relief can be granted, is whether the pleadings even "suggest[ ]" a basis for the requested relief. *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 746, 563 *A.*2d 31 (1989). The reviewing court is assessing only the legal sufficiency of the claim, *Sickles v. Cabot Corp.*, 379 *N.J.Super.* 100, 106, 877 *A.*2d 267 (App.Div.), *certif. denied*, 185 *N.J.* 297, 884 *A.*2d 1267 (2005), so "[a]t this preliminary stage of the litigation the Court is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint." *Printing Mart, supra,* 116 *N.J.* at 746, 563 *A.*2d 31. We instead accept the factual allegations as true, *Sickles, supra,* 379 *N.J.Super.* at 106, 877 *A.*2d 267, and " 'search[ ] the complaint in depth and with liberality to ascertain

whether the fundament of a cause of action may be gleaned even from an obscure statement of claim[.]' " *Printing Mart, supra*, 116 *N.J.* at 746, 563 *A.*2d 31 (internal quotations and citation omitted). However, we have also cautioned that legal sufficiency requires allegation of all the facts that the cause of action requires. *Sickles, supra,* 379 *N.J.Super.* at 106, 877 *A.*2d 267. Without such allegations, the claim must be dismissed. *Ibid.*

### A. The statute and regulations.

The Food, Drug, and Cosmetic Act, 21 *U.S.C.A.* §§ 301–399 (FDCA), did not cover devices until Congress enacted the Medical Device Amendments of 1976 (MDA), which added 21 *U.S.C.A.* §§ 360c–360m to the FDCA. *Medtronic, Inc. v. Lohr,* 518 *U.S.* 470, 475–476, 116 *S.Ct.* 2240, 2246, 135 *L.Ed.*2d 700, 709–10 (1996). The MDA also extended some general provisions of the FDCA to apply to devices as well as to drugs, for example, 21 *U.S.C.A.* § 351 on adulteration and 21 *U.S.C.A.* § 352 on misbranding. Even without regard to such modification, the FDCA's general provisions about manufacturing standards, labeling, and standing to enforce have been construed after the MDA's enactment as equally applicable to devices and drugs. *See, e.g., Buckman Co. v. Plaintiffs' Legal Comm.,* 531 *U.S.* 341, 349, 121 *S.Ct.* 1012, 1017–18, 148 *L.Ed.*2d 854, 861–62 (2001).

A device is misbranded if the label is "false or misleading" in any way. 21 *U.S.C.A.* § 352(a). A device is also misbranded "[u]nless its labeling bears ... warnings against use in those pathological conditions ... where its use may be dangerous to health," and any necessary warnings against unsafe "methods ... of administration[.]" 21 *U.S.C.A.* § 352(f).

As noted, Cypher was a new kind of Class III device, which required premarket approval (PMA). 21 *U.S.C.A.* § 360c(a)(1)(C). The applicant for PMA of a Class III device had to demonstrate its safety and effectiveness in "the persons for whose use the device is represented or intended" and "with respect to the conditions of use prescribed, recommended, or suggested in the label[.]" 21 *U.S.C.A.* § 360c(a)(2)(A)-(B). The applicant thus had

to provide "a detailed description of the proposed conditions of use of the device," 21 *U.S.C.A.* § 360c(a)(3)(D)(i); a sample label delineating the intended uses, 21 *U.S.C.A.* § 360e(c)(1)(F); and "full reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective[.]" 21 *U.S.C.A.* § 360e(c)(1)(A).

A manufacturer is required to follow the design controls process as enumerated in 21 *C.F.R.* § 820.30. In addition to design controls, the manufacturer must also comply with manufacturing controls outlined at 21 *C.F.R.* § 814.20(b)(4) and § 820. These controls require the manufacturer to submit to the FDA a complete description of the methods used in, and the facilities and controls used for, the manufacture, processing, packing, storage, and where appropriate, installation of the device. As to labeling of the medical device, 21 *C.F.R.* § 801.5 requires a manufacturer to give adequate directions for the use of a medical device such that a "layman can use a device safely for the purposes for which it is intended[,]" and Section 801.15 includes requirements for how the label must appear.

PMA approval thus incorporates an FDA finding that the device is safe and effective under the conditions of use included on the label and that the label is not false or misleading. 21 *U.S.C.A.* § 360e(d)(1)(A), (2). The manufacturer may not change the label, even to add warnings, until it submits the proposed change as part of a "supplemental" PMA application and obtains FDA approval. 21 *U.S.C.A.* § 360e(d)(6); *Riegel, supra,* 552 *U.S.* at 319, 128 *S.Ct.* at 1005, 169 *L.Ed.*2d at 900. This preserves the balance that the FDA is presumed to have struck, during the "exhaustive" PMA process, between the imperative of safety and Congress's recognition in 21 *U.S.C.A.* §§ 360k and 396, discussed below, of the importance of off-label use to the continuing improvement of medical practice. *See Buckman, supra,* 531 *U.S.* at 349–51, 121 *S.Ct.* at 1017–19, 148 *L.Ed.*2d at 861–63.

After approval, the device's manufacturer must report to the FDA whenever it "becomes aware of information that reasonably suggests" a "significant adverse device experience[.]" 21 *U.S.C.A.* § 360i(a)(1), (3). It must also perform whatever post-marketing surveillance, evaluation, and reporting the FDA ordered as a condition of approval. 21 *U.S.C.A.* § 360l.

The MDA includes an express preemption provision against state standards for PMA-approved devices that would be stricter than the MDA:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> > (1) which is different from, or in addition to, any requirement applicable under this Act to the device, and
> >
> > (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act. [21 *U.S.C.S.* § 360k(a).]

Two decades after it enacted the MDA, Congress clarified that the off-label use of devices was not illegal *per se*, by denying the FDA any power "to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." 21 *U.S.C.A.* § 396. It also provided a safe harbor for manufacturers of Class III devices to "disseminate" to health-care providers peer-reviewed articles or "reference publications" "concerning the safety, effectiveness, or benefit of a use not described in the approved labeling[.]" 21 *U.S.C.A.* §§ 360aaa, 360aaa–1. However, if a manufacturer wishes to do so, it must also apply for approval of such a use. 21 *U.S.C.A.* § 360aaa–3(a).

Adherence to those rules made the safe harbor absolute: "[n]otwithstanding . . . any other provision of law, the dissemination of information relating to a new use of a drug or device, in accordance with" it "shall not be construed . . . as evidence of a new intended use of the drug or device that is different from the intended use of the drug or device set forth in the official labeling of the drug or device." 21 *U.S.C.A.* § 360aaa–6(b). The safe

harbor thus mitigated the effect of 21 *C.F.R.* § 801.4, the 1976 FDA regulation that required even manufacturers that engaged in no promotion of off-label uses to add label warnings about any off-label use of which it had "notice."[3] *Riley, supra,* 625 *F.Supp.*2d at 781–83.

As for enforcement, all "proceedings for enforcement" of the FDCA must by brought "by and in the name of the United States." 21 *U.S.C.A.* § 337(a). The statute leaves "no doubt" that it prohibits private actions in which the only wrongdoing is violation of a federal law or standard. *Buckman, supra,* 531 *U.S.* at 349 n. 4, 121 *S.Ct.* at 1018 n. 4, 148 *L.Ed.*2d at 862 n. 4. That prohibition requires a plaintiff to characterize his or her claims about a device as violations of state law, which 21 *U.S.C.A.* § 360k or 21 *U.S.C.A.* § 396 may then preempt as the following case law elucidates.

### B. The governing federal case law.

In areas of traditional state regulation like health and safety, which for the first thirty-eight years of the FDCA included medical devices, the presumption against federal preemption is reinforced by requiring a "clear and manifest purpose of Congress" of having intended such preemption. *Lohr, supra,* 518 *U.S.* at 475–76, 484–86, 116 *S.Ct.* at 2245–46, 2250–51, 135 *L.Ed.*2d at 709–10, 715–16. Even with the passage of the MDA, Congress did not intend to insulate medical devices from all state common law causes of action, because if that were the true intention, Congress could easily have drafted 21 *U.S.C.A.* § 360k to preclude all "remedies" under state law. *Id.* at 487–88, 116 *S.Ct.* at 2251–52, 135 *L.Ed.*2d at 717.

Instead, Congress chose to preclude only two types of state "requirements" that differed from federal requirements. One was state requirements that differed from requirements in "statutory

---

[3] While the safe harbor statutes expired on September 30, 2006, under a sunset provision, the FDA has continued to take the same position as a matter of policy. *See Riley, supra,* 625 *F.Supp.*2d 769 at 781 n. 6, 782 n. 7.

and regulatory law that exists pursuant to the MDA itself[.]" *Id.* at 489, 116 *S.Ct.* at 2252, 135 *L.Ed.*2d at 718. The other was state requirements relating to the safety or effectiveness of devices, a construct that "appears to presume that the State is imposing a specific duty upon the manufacturer" in relation to the device's safety or effectiveness. *Id.* at 487–88, 116 *S.Ct.* at 2251–52, 135 *L.Ed.*2d at 717.

"[S]pecific duty," in turn, means "device-specific enactments of positive law by legislative or administrative bodies, not the application of general rules of common law by judges and juries" that the state cause of action would impose on all manufacturers, not just those of medical devices. *Id.* at 488–89, 497–500, 116 *S.Ct.* at 2252, 2256–57, 135 *L.Ed.*2d at 717–18, 723–24. Only requirements specific to devices would merit the deferential presumption that "the [f]ederal [g]overnment has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." *Id.* at 500–01, 116 *S.Ct.* at 2258, 135 *L.Ed.*2d at 725. Federal requirements "regarding a specific device or [the] field of device regulation[,]" as opposed to requirements that "reflect important but entirely generic concerns about device regulation generally," were the only ones that Congress was concerned "to protect from potentially contradictory state requirements." *Id.* at 501, 116 *S.Ct.* at 2258, 135 *L.Ed.*2d at 725.

Turning to the nature of the state law claims before it, *Lohr* acknowledged that common-law duties that "parallel federal requirements" but then add elements, such as the existence of negligent conduct, may literally be "different from" the federal requirement. *Id.* at 495, 116 *S.Ct.* at 2255, 135 *L.Ed.*2d at 721–22. However, because they do not impose additional burdens on the manufacturer, and instead compel additional proofs to afford a remedy, they are actually more protective of the manufacturer. *Id.* at 495–96, 116 *S.Ct.* at 2255–56, 135 *L.Ed.*2d at 721–22.

*Lohr*'s seeming openness to state causes of action, however, occurred in reference to a medical device introduced into the market through a much less rigorous federal review process than the Cypher at issue here. In *Lohr*, the question of preemption arose in the context of an approval of a medical device under the alternate statutory requirement of 21 *U.S.C.A.* § 360k, as being "substantially equivalent" to the relevant pre–1976 devices and therefore "grandfathered" into approval. Because the device at issue in *Lohr* was covered only by *generally* applicable federal labeling and manufacturing requirements, and there was no federal requirement directed specifically to that particular device, there was no prospect of conflict in the dual schemes specific to device safety and effectiveness, and consequently the MDA did not preempt the plaintiffs' state tort claims. *Supra,* 518 *U.S.* at 501, 116 *S.Ct.* at 2258, 135 *L.Ed.*2d at 725.

By contrast, *Riegel* involved a balloon catheter, a Class III device approved under the PMA regime. *Supra,* 552 *U.S.* at 320, 128 *S.Ct.* at 1005, 169 *L.Ed.*2d at 900. Riegel suffered a heart attack, and shortly after the heart attack underwent a coronary angioplasty. *Ibid.* His artery was heavily calcified and diffusely diseased. *Ibid.* During surgery, his surgeon attempted to dilate the artery by using the catheter, despite the label's contraindications, which stated the catheter was not for use in patients with calcified or diffuse stenoses. *Ibid.* Also, during this operation, Riegel's surgeon inflated the catheter to a pressure of 10 atmospheres five times, in spite of the label's warning that the catheter should not be inflated beyond a pressure of eight atmospheres, the rated burst pressure. *Ibid.* On the fifth inflation, the catheter burst. *Ibid.* Riegel then developed a heart block, had to be placed on life support, and ultimately, emergency coronary bypass surgery was necessary. *Ibid.*

The patient brought state claims for strict liability, breach of implied warranty, and "negligence in the design, testing, inspection, distribution, labeling, marketing, and sale" of the device, which were dismissed on summary judgment. *Id.* at 320, 128 *S.Ct.*

at 1005–06, 169 *L.Ed.*2d at 900–01. He did not allege that the manufacturer violated any federal requirements. *Riegel v. Medtronic, Inc.,* 451 *F.*3d 104, 106 (2d Cir.2006), *aff'd,* 552 *U.S.* 312, 128 *S.Ct.* 999, 169 *L.Ed.*2d 892 (2008). In its answer, Medtronic raised the affirmative defense of federal preemption. *Id.* at 107.

The Supreme Court explained that its first task was to determine just what federal "requirements" were applicable to the specific device. *Riegel, supra,* 552 *U.S.* at 321, 128 *S.Ct.* at 1006, 169 *L.Ed.*2d at 901 (quoting 21 *U.S.C.A.* § 360k(a)(1)). The second task was to determine whether the state-law claims were "based upon" state requirements that related to safety or effectiveness, and if so, whether they were "different from, or in addition to[,]" the federal requirements. *Ibid.*

Turning to the state claims, and distinguishing *Lohr,* *Riegel* observed that they were not just related to, but rather centered on, the device's safety and effectiveness in its approved use. *Id.* at 327–30, 128 *S.Ct.* at 1009–11, 169 *L.Ed.*2d at 904–07. Common law claims are premised on the violation of a substantive legal obligation, which in the context of a negligence or strict liability claim amount to a "requirement," and 21 *U.S.C.A.* § 360k preempted all such requirements. *Id.* at 323–24, 128 *S.Ct.* at 1007–08, 169 *L.Ed.*2d at 902–03. The Court reasoned that the mere existence of federal and state requirements created the potential for multiple standards of conduct for the design and marketing of devices, which was precisely what Congress intended to avoid. *Id.* at 323–24, 128 *S.Ct.* at 1007–08, 169 *L.Ed.*2d at 902–03. It was irrelevant that the state common law obligations applied to all products rather than just medical devices, because 21 *U.S.C.A.* § 360k prohibited any state requirement whenever there was a federal requirement specific to devices, no matter how general the state requirement may be. *Id.* at 327–28, 128 *S.Ct.* at 1009–10, 169 *L.Ed.*2d at 905. Thus, the Court interpreted the statutory language as preempting all state causes of action that created the possibility of "a jury determination that the FDA-approved labeling for a pacemaker violated a state common-law

requirement for additional warnings." *Id.* at 329, 128 *S.Ct.* at 1011, 169 *L.Ed.*2d at 906.

*Riegel* expressly recognized that its interpretation of 21 *U.S.C.A.* § 360k would categorically deny judicial redress under state law for consumers injured by devices to which the FDA gave premarket approval. *Id.* at 326, 128 *S.Ct.* at 1008–09, 169 *L.Ed.*2d at 904. The Court believed that the statutory language "suggests that the solicitude for those injured by" such devices "was overcome in Congress's estimation by solicitude for those who would suffer without new medical devices if juries were allowed to apply the tort law of 50 States to all innovations." *Id.* at 326, 128 *S.Ct.* at 1009, 169 *L.Ed.*2d at 904.

Having said all that, *Riegel* did not strip plaintiffs of any and all recourse for injuries from a medical device. To the contrary, the Court expressly held that the MDA preempted only state claims that applied substantive standards of liability *different* from the federal requirements specific to devices. *Id.* at 330, 128 *S.Ct.* at 1011, 169 *L.Ed.*2d at 906. *Riegel* agreed with *Lohr* that the "different from, or in addition to" language in 21 *U.S.C.A.* § 360k meant that the statute "does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations[,]" because "the state duties in such a case 'parallel,' rather than add to, federal requirements." *Ibid.* (quoting *Lohr, supra,* 518 *U.S.* at 495, 116 *S.Ct.* at 2255, 135 *L.Ed.*2d at 721). *Riegel* did not, however, reach the plaintiffs' arguments that their state claims were parallel; it deemed them waived for lack of prior assertion. *Supra,* 552 *U.S.* at 330, 128 *S.Ct.* at 1011, 169 *L.Ed.*2d at 907.

*Lohr* and *Riegel* did not involve a claim that a device's manufacturer had intended or promoted an off-label use.[4] *Buckman* did,

---

[4] Although the device in *Riegel* was not indicated for that plaintiff, the Court never addressed whether claims of off-label use and/or marketing are a ground for avoiding preemption. 552 *U.S.* at 319–22, 128 *S.Ct.* at 1005–07, 169 *L.Ed.*2d at 900–02.

although the device had been approved as a substantial equivalent rather than under the PMA regime. Because such approval did not reflect any federal requirements for demonstrating safety or effectiveness, and with which the plaintiff's state law claims could conflict, such claims arguably were not *expressly* preempted by § 360k(a). But that did not end the inquiry because even though not expressly preempted, such claim may be *impliedly* preempted. *Buckman, supra,* 531 *U.S.* at 347–48, 121 *S.Ct.* at 1017, 148 *L.Ed.*2d at 861.

In *Buckman,* the plaintiff premised his state cause of action on the claimed federal violation that the manufacturer had committed "fraud on the FDA" by failing to disclose that it intended the device for off-label uses. *Ibid.* The Court explained that "[p]olicing fraud against federal agencies" was not a traditional field of primarily state regulation, which meant that "the relationship between a federal agency and the entity it regulates is inherently federal in character" and therefore, actionable only under federal law. *Id.* at 347–48, 121 *S.Ct.* at 1017, 148 *L.Ed.*2d at 860–61. A state cause of action for fraud on the FDA, including failure to disclose intended off-label uses, would conflict with the flexibility that Congress granted the FDA for two reasons: to balance the regulation of devices that had "potentially beneficial off-label uses" against the concern that "unpredictable civil liability" for off-label use would discourage manufacturers from seeking approval of substantially equivalent devices even for approved uses, and to avoid discouraging physicians from off-label uses despite their legality under 21 *U.S.C.A.* § 396. *Id.* at 348–51, 121 *S.Ct.* at 1017–19, 148 *L.Ed.*2d at 861–63. *Lohr*'s presumption against the preemption of state causes of action accordingly did not apply, so implied preemption due to the conflict with federal law sufficed to preclude the plaintiffs' claims. *Id.* at 348, 121 *S.Ct.* at 1017, 148 *L.Ed.*2d at 861. For that reason, *Buckman* declined to address whether the express preemption of 21 *U.S.C.A.* § 360k also applied. *Id.* at 348 n. 2, 121 *S.Ct.* at 1017 n. 2, 148 *L.Ed.*2d at 861 n. 2.

*Buckman* distinguished the fraud claims before it, which "exist solely by virtue of the FDCA disclosure requirements[,]" from the claims in *Lohr* that "arose from the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the violation of FDCA requirements." *Id.* at 352–53, 121 *S.Ct.* at 1019–20, 148 *L.Ed.*2d at 864. The state causes of action that had to be preempted, because they were in effect no more than *per se* claims for violation of a federal requirement, such as the fraud claim before it, were thus distinguishable from "state-law causes of actions that parallel federal safety requirements" as *Lohr* described. *Id.* at 353, 121 *S.Ct.* at 1020, 148 *L.Ed.*2d at 864.

Furthermore, *Buckman* addressed a detail about "parallel" state claims that *Lohr* did not have to reach. *Buckman* explained that a claim describes a "traditional" state law cause of action not simply because it contains required elements for the manufacturer's conduct beyond the violation of a federal requirement, but rather because it would provide the required elements of a state cause of action even with no reference to federal requirements as the measure of the reasonableness or wrongfulness of the manufacturer's conduct. *Id.* at 351–52, 121 *S.Ct.* at 1019, 148 *L.Ed.*2d at 863 (distinguishing claim in *Silkwood v. Kerr–McGee Corp.*, 464 *U.S.* 238, 104 *S.Ct.* 615, 78 *L.Ed.*2d 443 (1984), that relied on "traditional state tort law principles of the duty of care owed by the producer of plutonium fuel pins to an employee working in its plant," and "was not based on any sort of fraud-on-the-agency theory"). Regardless of how the plaintiff styles a state claim, if it is a claim that could not be articulated but for the existence of a federal requirement that was allegedly violated, it is functionally equivalent to a claim that is grounded solely on the federal violation, and is therefore impliedly preempted. *Id.* at 352–53, 121 *S.Ct.* at 1019–20, 148 *L.Ed.*2d at 864. *See also Riley, supra,* 625 *F.Supp.*2d at 776–77 (*Buckman* imposed implied preemption on state claims that "would not exist if the FDCA did not exist").

To recap, as construed by *Lohr, Riegel,* and *Buckman,* the federal statutes and regulations apply to a Class III device that must receive premarket approval (a PMA device), and preempt

state claims based on requirements different than, or in addition to, those inhering in the FDA's premarket approval. Such approval encompasses the device's design, manufacturing methods, and label, including the information to be given to patients. It represents the FDA's determination that the manufacturer's clinical trials have shown the device to be safe and effective for its intended use, and that the label is accurate and contains adequate warnings against unsafe uses. Deviations from the approved design and manufacturing process make a device "adulterated" and deviation from the approved label make it "misbranded."

PMA approval imposes a continuing duty on the manufacturer to report adverse events relating to the device that it knows or should know, as well as any studies or investigations about the device's safety or effectiveness. However, if such information indicates the need for an enhanced warning, the manufacturer must seek FDA approval before adding it to the label. Manufacturers have a safe harbor for promoting an off-label use, namely, distributing certain clinical study reports to physicians, as long as they also seek FDA approval for it.

The requirements for a PMA device are "device-specific" because they focus on the safety and effectiveness of such devices, and are applied to each device's particular characteristics. They are not the generic standards applied by the FDA to "substantially equivalent" devices. Therefore, to avoid the statutory preemption of state requirements that vary from federal requirements, a state claim concerning PMA devices must be parallel to the federal requirements, meaning that the state requirements it embodies must not impose any duty on the manufacturer beyond satisfying the federal requirements. However, to avoid the implied preemption of claims outside the traditional areas of state regulation, a claim concerning PMA devices must also represent a traditional state cause of action that would impose a duty on the manufacturer even if there were no federal requirements at all to be referenced, much less violated.

While plaintiffs are correct that the FDA does not literally "approve" off-label uses, because approval would axiomatically

make them label uses, they are incorrect to argue that the absence of affirmative approval mandates the finding that no federal requirements exist. Federal requirements for off-label use manifestly exist, in the form of the safe harbor for their promotion, and the obligation to seek a supplemental PMA to add warnings to the label for off-label uses even when the manufacturer has no desire to promote them. Furthermore, plaintiffs' argument presumes off-label use to be inherently suspect or substandard, which Congress rejected by enacting 21 *U.S.C.A.* § 396 to protect off-label use. *See Buckman, supra*, 531 *U.S.* at 350–51, 121 *S.Ct.* at 1018–19, 148 *L.Ed.*2d at 862–63. *See also Riley, supra*, 625 *F.Supp.*2d at 777–78 ("[g]iven what the Supreme Court said in *Buckman* about the off-label use of medical devices, it seems highly unlikely" that the Court intended in *Riegel* to declare off-label use a vacuum of federal requirements and therefore, broadly amenable to state claims).

## C. Application of the federal law to plaintiffs' claims.[5]

Plaintiffs brought their strict-liability claims under the Product Liability Act, *N.J.S.A.* 2A:58C–1 to –11(PLA), which governs all claims for harm caused by a product other than claims for breach of an express warranty. *N.J.S.A.* 2A:58C–1(b)(3). The allowable theories are that a product was harmful because it "deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae[;]" that it "failed to contain adequate warnings or instructions[;]" or that it "was designed in a defective manner." *N.J.S.A.* 2A:58C–2. The standard of liability is that the product "was not reasonably fit, suitable or safe for its intended purpose[.]" *Ibid.*

---

[5] Plaintiffs' brief suggests that they are also appealing the dismissal of the negligent misrepresentation and fraud claims, but the court did not reach them, because they were stated only in the original complaints, not in the amended master complaint. We are aware of no authority indicating that an amended pleading may only add to prior pleadings instead of entirely superseding them.

### (i) Design Defect

■ Plaintiffs alleged that Cypher's design was less safe and no more effective than bare-metal stents or drug-eluting stents using different polymer coating, as well as alternative medical treatments not involving stents, because, among other things, the polymer allegedly prevents healing of the artery and results in blood clots. The PLA would allow a jury to agree, without regard to the federal requirements for PMA approval, and without regard to any determination the FDA may have made that the device's design had advantages compared to the alternatives that justified a certain degree of increased risks. Because the PLA is a state law that provides a different standard for the adequacy of the device's design than the federal requirements, plaintiffs' design defect claim is not "parallel" to them and is thus squarely within *Riegel*'s preemption holding. *Brooks v. Howmedica, Inc.*, 273 *F.*3d 785, 796 (8th Cir.2001) (stating a claim that would allow a jury to require a different component in a PMA device is "surely" preempted by Section 360k), *cert. denied*, 535 *U.S.* 1056, 122 *S.Ct.* 1914, 152 *L.Ed.*2d 823 (2002); *Funk v. Stryker Corp.*, 673 *F.Supp.*2d 522, 531 (S.D.Tex.2009) (holding differing state law to be preempted); *Hughes v. Boston Scientific Corp.*, 669 *F.Supp.*2d 701, 710 (S.D.Miss.2009) (same); *Wolicki–Gables v. Arrow Int'l, Inc.*, 641 *F.Supp.*2d 1270, 1285–86 (M.D.Fla.2009) (same); *In re Medtronic, Inc.*, 592 *F.Supp.*2d 1147, 1162–64 (D.Minn.2009) (same).

### (ii) Manufacturing Defect

■ Unlike their claim for design defect, plaintiffs limit their allegations of manufacturing defect to what the FDA warning letter identifies as potential deviations from the device's approved design and manufacturing processes, or from the federal requirements under 21 *C.F.R.* §§ 820, 814.20(b)(4), and 814.39 on manufacturing practices crafted to identify and prevent product deviations. This claim reflects the traditional state regulation of the sale of adulterated products. In effect, it incorporates the federal

requirements of having to maintain fidelity to the manufacturer's own design and performance standards without allowing an alternative measure of the manufacturer's duty. The additional requirement that this state claim imposed on plaintiffs, proving that the deviations actually rendered the device unsafe or unsuitable for the intended uses, was acceptable because it narrowed the circumstances in which manufacturers could be liable compared to the federal scheme, instead of enlarging them.

A state claim with that effect is therefore parallel under *Riegel*'s construction of *Lohr* and not preempted. *Hofts v. Howmedica Osteonics Corp.*, 597 *F.Supp.*2d 830, 836–37 (S.D.Ind.2009). *Cf. Wolicki–Gables, supra,* 641 *F.Supp.*2d at 1285 (holding that a manufacturing defect claim was preempted because state law allowed liability even without violation of federal requirements); *Horowitz v. Stryker Corp.,* 613 *F.Supp.*2d 271, 282–83 (E.D.N.Y. 2009) (finding a claim was allowable as parallel, but the pleading of causation failed to satisfy federal standards). Indeed, the court in *Hofts, supra,* held that a manufacturing defect claim, based on an allegation that the device was adulterated due to failure to comply with federal regulations, was not preempted because a jury could find the defendants breached their duty of care to the plaintiff and that the product was unreasonably dangerous without imposing different or additional requirements. 597 *F.Supp.*2d at 836–37. *See also Riley, supra,* 625 *F.Supp.*2d at 789 (recognizing that a properly pled manufacturing defect claim may not be preempted and allowing the plaintiffs leave to replead their claim). Here, contrary to defendant's contention, plaintiffs' manufacturing defect claim was sufficiently pleaded, because the amended master complaint incorporated the FDA warning letter's assertion of manufacturing defects that could have affected the device's safety, in particular those concerning its polymer coating, along with inadequate controls to prevent or track the release of nonconforming product.[6]

---

[6] Aside from its preemption ruling, we also disagree with the Law Division's incorporated finding that Vonnie failed to allege the manufacturing defect was

*(iii) Failure to Warn*

 The PLA is a strict-liability standard that focuses on "the actual condition of the product" rather than on the reasonableness of the manufacturer's conduct. *Coffman v. Keene Corp.*, 133 *N.J.* 581, 598, 628 *A.2d* 710 (1993). Thus, the manufacturer has a duty to warn of "dangers" that it knew, or that it "should have known on the basis of reasonably obtainable or available knowledge." *Feldman v. Lederle Labs.*, 97 *N.J.* 429, 434, 479 *A.2d* 374 (1984). It satisfies that duty by giving "an adequate warning or instruction." *N.J.S.A.* 2A:58C–4.

 A warning that "has been approved or prescribed by" the FDA under the FDCA carries a rebuttable presumption of adequacy. *Ibid.* "For all practical purposes, absent deliberate concealment or nondisclosure of after-acquired knowledge of harmful effects, compliance with FDA standards should be virtually dispositive of such claims." *Perez v. Wyeth Labs.*, 161 *N.J.* 1, 25, 734 *A.2d* 1245 (1999).

The warnings that plaintiffs allege defendants had a duty to provide related to the duration of antiplatelet therapy needed to ensure the regrowth of endothelium over the device, or to the lack of comparative safety studies of the polymer coating used by Cordis versus the alternatives. The FDA did not require defendants to provide such information for its review of the device's safety and effectiveness, or to place such information on the label or the patient information materials. The FDCA's rebuttable presumption thus barred a claim about the failure to give such warnings for approved uses in the absence of deliberate nondisclosure, and such a claim was also expressly preempted under *Riegel*

---

the proximate cause of Billie's injury because she did not directly connect the injury to the violations named in the FDA warning letter. Although not specifically addressed by defendants on appeal and despite the dismissal of Vonnie's complaint as untimely, we expressly vacate the court's ruling on the adequacy of the pleading to avoid its misapplication to the other plaintiffs on remand.

as an additional state requirement on defendants. *Hughes, supra,* 669 *F.Supp.*2d at 710; *Riley, supra,* 625 *F.Supp.*2d at 780–81.

However, when the claim about the failure to warn for approved uses was combined with allegations of nondisclosure, it became a claim within a traditional area of state regulation that would have existed even in the absence of federal requirements. To that extent, it satisfied *Buckman*'s test for avoiding implied preemption as a claim that amounted to no more than "fraud on the FDA." *Hughes, supra,* 669 *F.Supp.*2d at 709–10. While it is true that the "misconduct" underlying plaintiffs' claims also constitutes a violation of federal regulations—indeed that is precisely why the claims are parallel—the suit was brought to vindicate plaintiffs' rights, not the FDA's. Plaintiffs adequately pled that claim.

On this score, we also take issue with the Law Division's holding that plaintiffs' pleading failed to overcome the presumption that the device's FDA-approved label was adequate. The basis for the court's ruling was that the FDA, notwithstanding defendants' alleged withholding of information and failure to provide warnings about off-label use, was otherwise "well informed" that the off-label use of the device was "prevalent." The court found further that plaintiffs had "not provided enough evidence to show" that defendants had acted deliberately, which was required for overcoming the presumption. We disagree with the court's reasoning.

As already noted, 21 *U.S.C.A.* § 360i requires defendants to submit information after approval that reasonably suggested adverse device experiences. Plaintiffs' amended complaint clearly implied that defendants commissioned post-marketing studies that contained reportable adverse experiences, and further alleged that these studies demonstrate the label's inadequacy concerning the need for extended antiplatelet therapy, even for approved uses. While defendants supposedly withheld them from the FDA and the advisory panel, they allegedly distributed altered versions of them to physicians, to promote both approved and off-label uses with misrepresentations about the length of antiplatelet therapy and about overall safety. According to plaintiffs' complaint, sub-

mission of the studies as federal law required would have caused the FDA to improve the label, and any heightened warnings concerning approved uses would also have increased the safety of off-label uses.

The conduct and consequences that plaintiffs alleged constituted the kind of deliberate nondisclosure needed to overcome the PLA's presumption of adequacy for an FDA-approved label. *Perez, supra,* 161 *N.J.* at 25, 734 *A.*2d 1245. The allegations of plaintiffs' amended complaint must be accepted as true on a motion to dismiss, and as such, the complaint sufficiently pled such deliberate violations of defendants' federal responsibilities to rebut the presumption. The Law Division erred in requiring plaintiffs to *prove* such deliberate nondisclosures at the motion to dismiss stage.

■ Turning to off-label uses, the PLA permits claims only relating to a product's "intended purpose." As discussed above, federal law does not treat an off-label use as "intended" when the manufacturer simply has knowledge of it or is promoting it within the safe harbor. Any basis for treating such circumstances as an intended use of the product for PLA purposes would be invalid under *Riegel* for imposing duties on the manufacturer in addition to the federal requirements. In other words, under federal law manufacturers are "obligated to warn only about intended uses, and, under the safe harbor, evidence of the dissemination of information about an off-label use [is] deemed not to be evidence of an intended use that was different from the use on the label." *Riley, supra,* 625 *F.Supp.*2d at 782; *see also* 21 *U.S.C.A.* § 360aaa–6(b).

On this score, we reject plaintiffs' argument that because § 360k(a) only applies when a medical device is used in a manner that was reviewed and approved by the FDA, then § 360k(a) should not preempt any of their claims against defendants arising out of the off-label use of the Cypher stent. *See Riley, supra,* 625 *F.Supp.*2d at 777. Indeed, in *Riegel, supra,* the plaintiffs' claims were found to be preempted by § 360k(a) even though the balloon

catheter at issue there had been used off-label. 552 *U.S.* at 320, 128 *S.Ct.* at 1005, 169 *L.Ed.*2d at 900. And in *Buckman, supra,* the Supreme Court recognized that off-label usage is not illegal or even disfavored under federal law. 531 *U.S.* at 350–51, 121 *S.Ct.* at 1018–19, 148 *L.Ed.*2d at 862–63.

It is, however, only when the manufacturer promotes an off-label use without abiding the requirements or limitations of the safe harbor that federal law regards the off-label use as an intended use, triggering the duty to provide instructions or warnings about that off-label use. *Riley, supra,* 625 *F.Supp.*2d at 781–82. All such activity is in violation of the federal requirements, so the PLA would then be a parallel requirement, while also reflecting a traditional state law cause of action. A claim that promotion of off-label use beyond the safe harbor was coupled with a failure to warn would not be preempted. *Id.* at 783–84. ("Insofar as [plaintiff] sufficiently alleges that, in the course of unlawfully promoting the Cypher stent for off-label use, Cordis failed to adequately warn of foreseeable dangers of that use, [plaintiff] may succeed in asserting a claim that is neither expressly or impliedly preempted.") The federal violation did not have to be the withholding of information from the FDA, because there were other ways in which promotion could exceed the safe harbor.

Here, plaintiffs alleged Billie Cornett was a diabetic and while the Cypher stent was not FDA-approved for marketing or use in diabetics, defendants marketed the device for such use.[7] If that were the extent of the allegation, it would not have succeeded as preempted because, as noted, the lack of federal requirements does not mean off-label marketing is prohibited entirely. To the contrary, the FDA's failure to require adequate off-label warnings for devices promoted within the safe harbor is a deliberative decision in and of itself that warrants preemptive force. But

---

[7] Although, as noted, Vonnie's cause of action has been dismissed as untimely, the remaining plaintiffs and the master complaint allege similar off-label deviations against Cordis, and therefore, we proceed to address the issue.

plaintiffs' complaint goes much further.[8] Plaintiffs also allege that defendants affirmatively promoted the off-label use of the Cypher stent in a manner that violated federal law, specifically 21 *C.F.R.* §§ 99.101, 803.10(c), 803.50, 814.39; that defendants were aware or should have been aware of the dangers inherent in the off-label uses from post-approval studies they performed revealing a significant adverse event rate associated with their device's unapproved uses yet affirmatively represented that there were "no stent thrombosis or mortality differences between the off-label [ ] subgroups ... [and] indicated [*i.e.* on-label subgroups] ..."; and that while marketing the device in violation of federal law, defendants failed to include adequate warnings about the off-label use they were promoting. Under the liberal standard of review for a motion to dismiss, we conclude that plaintiffs' allegation of off-label promotion without adequate warnings was a sufficient pleading.

### (iv) Breach of Express Warranty

Like other state requirements that exceed federal requirements for a PMA device, a state claim that allows liability for statements in the FDA-approved label and other documentation is preempted. *Riley, supra,* 625 *F.Supp.*2d at 787–88 (noting split among decisions that pre-dated *Riegel* ); *Horowitz, supra,* 613 *F.Supp.*2d at 285. Thus, to the extent plaintiffs' complaint alleges that an express warranty was created by a "patient information guide" and a "product identification card," it is

---

[8] Plaintiffs' master complaint alleges:

Defendants knew or should have known that the [Cypher] stent was a dangerously defective product that posed unacceptable risks unknown and unknowable by the consuming public of serious adverse health events and related conditions and diseases, including, among other things, the necessity of long-term dual and anti-platelet therapy using aspirin and Plavix®. The [Cypher] stent was defective due to inadequate warnings because after [d]efendants knew or should have known of the risk of dangerous side effects and potentially fatal health risks, they failed to provide adequate warnings to consumers of the product and continued to aggressively promote and market the dangerously defective [Cypher] stent.

preempted because the FDA already reviewed and approved this information as part of the device's labeling in conjunction with the Cypher's PMA. Accordingly, that part of plaintiffs' express warranty claims premised on the contents of the Cypher's "label" squarely conflicts with the FDA's PMA of the Cypher and its labeling and is therefore preempted by § 360k(a).

However, a claim for breach of express warranty based on voluntary statements, meaning any statement that the FDA did not approve or mandate, is not preempted. *Riley, supra,* 625 *F.Supp.*2d at 788; *Horowitz, supra,* 613 *F.Supp.*2d at 285–86 (the claim foundered instead on a peculiarity of state law). This would apply for voluntary statements concerning approved uses, and for voluntary statements concerning off-label uses that were outside the safe harbor. "Federal law already requires Cordis to ensure that any warranty statements it voluntarily makes are truthful, accurate, not misleading, and consistent with applicable federal and state law." *Riley, supra,* 625 *F.Supp.*2d at 788. Therefore, to the extent plaintiffs seek to impose liability on defendants for voluntarily making warranties, plaintiffs are not imposing any different or additional requirements on defendants.

### (v) Breach of Implied Warranty

The preclusion of breach of implied warranty by federal law is moot, because the PLA subsumed those claims. With the sole exception of its accommodation for breach of express warranty, the PLA displaces all other causes of action "for harm caused by a product, irrespective of the theory underlying the claim[.]" *N.J.S.A.* 2A:58C–1(b)(3). This preclusion of breach of implied warranty "as a viable separate claim" is "definitive." *Tirrell v. Navistar Int'l, Inc.,* 248 *N.J.Super.* 390, 398, 591 *A.*2d 643 (App. Div.), *certif. denied,* 126 *N.J.* 390, 599 *A.*2d 166 (1991). *Accord Koruba v. Am. Honda Motor Co., Inc.,* 396 *N.J.Super.* 517, 531, 935 *A.*2d 787 (App.Div.2007), *certif. denied,* 194 *N.J.* 272, 944 *A.*2d 32 (2008).

### (vi) PLA Punitive Damages

For PMA devices, the PLA allows punitive damages only "where the product manufacturer knowingly withheld or misrepresented information required to be submitted under the [FDA]'s regulations, which information was material and relevant to the harm in question[.]" *N.J.S.A.* 2A:58C–5(c). Instead of making punitive damages an aspect of a common-law claim for compensatory damages (or of the statutory replacement for such a claim), the Legislature enacted a separate statute that was "narrowly drawn" with "the single focus upon fraud on the FDA" as unlawful conduct that the State had an interest in punishing. *McDarby, supra*, 401 *N.J.Super.* at 90–93, 949 *A.*2d 223. *Buckman* accordingly precludes all claims that the FDA would have responded differently to an application if the manufacturer had fully and accurately provided all the information that federal law required. *Id.* at 93–94, 949 *A.*2d 223. That is the nature of the punitive damages claim here, and consequently such a claim is preempted.

### (vii) Wrongful Death, Loss of Consortium and Survivorship

The Law Division dismissed these claims solely for being derivative of the strict liability and breach of warranty claims it found expressly preempted. Thus, to the extent the predicate causes of action survive defendants' preemption challenge, the derivative claims for wrongful death, loss of consortium and survivorship must stand as well.

### III.

In sum, we find the following claims of plaintiffs not to be preempted: manufacturing defect; failure to warn concerning both approved and off-label uses, to the extent that plaintiffs based it on allegations of failure to satisfy federal requirements on disclosure or federal limitations on off-label promotion within the safe harbor, respectively; and breach of express warranty, to the extent that plaintiffs based it on voluntary statements relating to approved uses, or on voluntary statements about off-label uses

that were outside the safe harbor. As noted, reversal of the *Rule* 4:6–2(e) dismissal of these predicate claims compels reinstatement of plaintiffs' derivative claims for wrongful death, loss of consortium, and survivorship. The dismissal of plaintiffs' remaining claims, however, was proper as either federally preempted or precluded by the PLA itself. Lastly, the dismissal of plaintiff Cornett's complaint as untimely was required under both Kentucky's and New Jersey's law of repose.

Affirmed in part; reversed and remanded in part.